FLORENCE MIZE et al., Petitioners, v. STATE DIVISION OF HUMAN RIGHTS et al., Respondents.

Fourth Department, February 25, 1972.

Heller & Ramm (Edward Heller of counsel), for petitioners.

Anthony Manguso, Corporation Counsel (James J. McLoughlin of counsel), for City of Buffalo, respondent.

McMahon & Crotty (Thomas P. McMahon of counsel), for Police Benevolent Association, respondent.

*Henry Spitz* for State Division of Human Rights, respondent.

MOULE, J. Petitioners are women employed by the City of Buffalo to guard prisoners in the female cell block at police headquarters. In this proceeding, they seek review and reversal of an order of the Human Rights Appeal Board which reversed an order of the Commissioner of Human Rights and dismissed their complaints against the City of Buffalo (City) and the Police Benevolent Association (PBA). In their complaints, they alleged that they performed the same duties as patrolmen assigned as guards in the male cell block, but that a contract entered between the City and the Erie Club, the predecessor of the PBA, provided that they would receive $2,000 a year less than the men.

The issues presented are whether the City or the PBA denied petitioners equal pay for equal work and, if so, whether the matrons are entitled to back pay.

A hearing was held before a Hearing Examiner for the State Division of Human Rights. The record discloses that the City employs 1,224 patrolmen, 16 policewomen, and 6 matrons. The primary function of the matrons is the custodial care of prisoners in the female cell block at police headquarters. Any woman arrested in the City of Buffalo, regardless of the charge, is brought to the female cell block at police headquarters. When a female prisoner is brought in, she is "frisked" by the matron for weapons and then taken to a cell where her clothes and person are searched. The prisoner is then locked up and a record made of her belongings. A record is also made of the name of the prisoner, date of birth, address, arresting officer, the charge, the time of entry, the cell number, and the name of the officer who brought the prisoner in. In felony cases, the matron also escorts the prisoner to the male cell block for photographing and fingerprinting.

There is no separate civil service classification for guards in the male cell block at police headquarters. These duties are performed by 8 patrolmen who are referred to as "turnkeys". There was uncontradicted testimony at the hearing that the matrons performed the same duties as turnkeys except that the turnkeys made out the court sheets for the male and female prisoners. A high school education is required for patrolmen and policewomen, and the examinations are comparable in content. Only a grade school education is required for the position of matron. However, no matron's examination has been given since 1955 and all matrons appointed since 1959 were taken from the list of those eligible for appointment as policewomen.

On September 10, 1968 a contract was entered into between the City of Buffalo and the Erie Club, which provided for a salary range of $7,015 to $9,225 for patrolmen and policewomen, and $5,785 to $7,225 for matrons.

The Commissioner found that matrons and turnkeys were counterpart positions, that there was no requirement that turnkeys be patrolmen, and that during the course of their respective employment, the matrons performed substantially the same duties and had substantially the same responsibilities as the turnkeys. He concluded that the performance of duties and not the turnkeys' status as patrolmen should be the determining factor, and that, since the matrons received less pay than the turnkeys, the City and the PBA discriminated against them because of their sex. He ordered the City and the PBA to cease and desist from their discriminatory practices and to pay back wages from August 5, 1968, the effective date of the contract. The Appeal Board held that the findings of the Commissioner were not supported by substantial evidence and that his order was arbitrary, capricious and an unreasonable abuse of discretion, and it dismissed the complaints.

The basis for the Appeal Board's reversal was that the duties of matrons did not encompass the scope of duties of patrolmen and, since turnkeys remained patrolmen at all times and were subject to reassignment, the matrons were not entitled to equal pay.

Section 194 of the Labor Law provides in part: "No employee shall be paid a wage at a rate less than the rate at which an employee of the opposite sex in the same establishment is paid for equal work on a job the performance of which requires equal skill, effort and responsibility".

Section 296 of the Executive Law provides in part:

"1. It shall be an unlawful discriminatory practice:

"(a) For an employer, because of the age, race, creed, color, national origin or sex of any individual * * * to discriminate against such individual in compensation or in terms, conditions or privileges of employment. * * *

"(c) For a labor organization, because of the age, race, creed, color or national origin or sex of any individual * * * to discriminate in any way against any of its members".

The key issue is, what is a "job" for purposes of application of the equal pay standard. There is no New York case in point; but under Federal law, actual performance is the determining factor. The Federal statute on equal pay for equal work (Fair Labor Standards Act; U. S. Code, tit. 29, § 206,

subd. [d], par. [1]) is virtually identical to the New York statute, and the regulations of the United States Department of Labor provide that: "Application of the equal pay standard is not dependent upon job classifications or titles but depends rather on actual job requirements and performance." (Code of Fed. Reg., tit. 29, § 800.121).

This regulation has been approved by a number of Federal cases. (*Hodgson* v. *Daisy Mfg. Co.*, 317 F. Supp. 538; *Krumbeck* v. *John Oster Mfg. Co.*, 313 F. Supp. 257; *Wirtz* v. *Rainbo Baking Co.*, 303 F. Supp. 1049.)

Two recent Federal decisions illustrate the application of the actual performance test to the equal pay for equal work issue. In *Schultz* v. *First Victoria Nat. Bank* (420 F. 2d 648) the employer attempted to justify the difference in salary between male bank tellers and female bank tellers because the male tellers were being trained for eventual promotion to executive positions. The court gave no weight to potential performance of the male tellers and held that, if the female tellers performed equal work, they were entitled to equal pay.

In *Schultz* v. *Wheaton Glass Co.* (421 F. 2d 259) an employer sought to justify a lower wage for female packers because of the flexibility of the male packers who could perform other jobs such as lifting and moving heavy cartons. The court held that the mere flexibility of the male packers did not justify a wage differential. The court did note that flexibility could be the basis of a wage differential if the economic value of the flexibility was proven. However, in the present case, there was no proof that the flexibility of the patrolmen assigned to guard duties had any economic value. Further, flexibility is not a factor in the present case, since in actual practice turnkeys are rarely given other assignments, as revealed by the testimony of the two turnkeys who had served for 8 and 10 years. There was also testimony that one of the turnkeys had served for 20 years and two others for 7½ years.

In support of its contention that the "job" in question is that of a policeman, the City cites a number of cases dealing with the status of policemen, which are not relevant, and also *Matter of Ryan* v. *City of New York* (228 N. Y. 16) and *Matter of Priess* v. *Waldo* (152 App. Div. 834, affd. 207 N. Y. 693). In *Ryan,* the court held that a patrolman did not become a turnkey because he performed work similar to that performed by turnkeys. In *Priess,* the court interpreted a section of the New York City Charter which provided that police matrons were to receive the same salary as police doormen. Subsequently, the position

of doorman was abolished and all doormen were made higher-paid patrolmen. It was held that the matrons were not entitled to the same pay as the patrolmen performing the functions formerly performed by doormen. These cases are not applicable, since equal pay for equal work was not an issue in either case.

We conclude that the "job" in question is the guarding of prisoners in the cell block at police headquarters. The evidence clearly and convincingly establishes that matrons perform substantially the same duties as the male guards and are, therefore, entitled to equal pay from the City.

As to the PBA, the claim is made that it failed properly to represent the matrons in contract negotiations with the City. There was testimony that the matrons advised the president of the PBA that they felt that they should be treated the same as the turnkeys. However, there is no proof as to what took place during the contract negotiations, except that the president of the PBA advised the City that the matrons were not assignable to other duties. There is nothing in the record to support a finding that the PBA discriminated against the matrons because of their sex.

The final question is whether the matrons should be awarded back pay to August 5, 1968. Section 297 (subd. 4, par. c, cl. [ii]) of the Executive Law provides that the order of the Commissioner may provide for the " upgrading of employees, with or without back pay ". However, no standard is set forth for determining when back pay should be awarded. We do not believe that back pay should be awarded in this instance, since the basic reason for the disparity in pay was not the underpayment of the matrons for the work performed but, rather, the assignment of overqualified personnel to the position of turnkey. We find that the award of back pay by the Commissioner was an abuse of discretion.

The determination of the Appeal Board that the " job " in question is that of patrolman is contrary to law and should be set aside and the determination of the Commissioner on that issue confirmed. The finding of the Commissioner that the City discriminated against petitioners is supported by substantial evidence and should be reinstated. The finding of the Commissioner that the PBA discriminated against petitioners is not supported by substantial evidence and was properly annulled. The order of the Commissioner awarding back pay was an abuse of discretion and should be set aside.

MARSH, J. P., WITMER, GABRIELLI and CARDAMONE, JJ., concur.

Determination of the Appeal Board unanimously annulled and that of the Commissioner reinstated in part, without costs, in accordance with the opinion by MOULE, J.